United States District Court
Eastern District of Michigan

**Shelby Davis**, as Next Friend of
**E.D.** a Minor,

     Plaintiff,                     Civil No.

v.                                 Honorable
                                       Mag. Judge

**Bay Regional Medical Center,** d/b/a
**McLaren Bay Region, Bradley W.**
**Merrills, M.D.,** and **Aliaa Makkiya,**
**M.D., and Sheri Block, R.N.,** Jointly
and Severally,

     Defendants.

---

# Notice of Removal

---

Federal defendants, Bradley W. Merrills, M.D., and Aliaa Makkiya, M.D.,
petitioners herein, by their attorneys, pursuant to 42 U.S.C. § 233(c), hereby
remove this action (Case No. 16-3362-NH-JS), which is now pending in Bay
County Circuit Court for the State of Michigan from said state court to the United
States District Court for the Eastern District of Michigan, Southern Division.

This action is removable because the federal defendants Bradley W.
Merrills, M.D., and Aliaa Makkiya, M.D., at all times relevant to this matter, were
employees of Great Lakes Bay Health Center, which has been deemed eligible for
coverage under the Federally Supported Health Centers Assistance Act of 1992

(Public Law 102-501), 42 U.S.C. § 233(g).  Accordingly, Great Lakes Bay Health Center is an "entity" within the meaning of 42 U.S.C. § 233(g), and Bradley W. Merrills, M.D., and Aliaa Makkiya, M.D., are employees of an entity within the meaning of 42 U.S.C. § 233(g), and therefore they are deemed to be employees of the United States Public Health Service covered by 42 U.S.C. § 233(a) and (c). (Ex. A – Deeming Letters).  Because they are deemed to be employees of the U.S. Public Health Service, defendants Bradley W. Merrills, M.D., and Aliaa Makkiya, M.D. are eligible for coverage under the FTCA pursuant to 42 U.S.C. § 233(a) and (g).  Under 42 U.S.C. § 233(a) and (g), a claim against the United States pursuant to the FTCA is the exclusive remedy available to the plaintiff in this case with respect to the alleged acts or omissions of federal defendants Bradley W. Merrills, M.D., and Aliaa Makkiya, M.D.

This action is also removable because the Attorney General, through his designee, Julie A. Beck, Chief of the Civil Division of the United States Attorney's Office for the Eastern District of Michigan, has certified that defendants Bradley W. Merrills, M.D., and Aliaa Makkiya, M.D. who have been deemed to be employees of the U.S. Public Health Service, were acting within the scope of their employment at the time of the incident out of which this suit arose.  (Ex. B – Certificate of Scope of Employment).

This removal is timely because an action may be removed under 42 U.S.C. 233(c) ". . . at any time before trial . . . ." A copy of the complaint that plaintiff filed in the Bay County Circuit Court is attached.

Respectfully submitted,

**Daniel L. Lemisch**
Acting United States Attorney

*s/Zak Toomey*

**Zak Toomey** (MO61618)
Assistant U.S. Attorney
211 W. Fort St., Ste. 2001
Detroit, MI  48226
(313) 226-9617
zak.toomey@usdoj.gov

Date:  November 6, 2017

## Certificate of Service

I hereby certify that on November 6, 2017, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notification of such filing to the following:

n/a

I further certify that I have mailed by U.S. mail the foregoing paper to the following non-ECF participants:

Bay County Circuit Court
1230 Washington Ave.
Bay City, MI  48708

Michael T. Ratton
Ratton Law Group, P.C.
201 E. 4th St.
Royal Oak, MI  48067

J. Brian MacDonald
Cline, Cline & Griffin, P.C.
503 South Saginaw St., Ste. 1000
Flint, MI  48502

s/Zak Toomey
**Zak Toomey**
Assistant U.S. Attorney

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF BAY

SHELBY DAVIS as Next Friend of
E█████ D████, a Minor,

     Plaintiff

-vs-

BAY REGIONAL MEDICAL CENTER
d/b/a MCLAREN BAY REGION,
BRADLEY W. MERRILLS, MD,
ALIAA MAKKIYA, MD, and
SHERI BLOCK, RN,
Jointly and Severally,

     Defendants.

_____/

CASE NO.  16 - 3662   NH JS

HON.   JOSEPH K. SHEERAN
        P# 28575

MICHAEL T. RATTON (P42399)
*Giroux Ratton, PC*
Attorneys for Plaintiff
28588  Northwestern Highway, Suite 100
Southfield, MI 48034
(248) 531-8665
michael@girouxratton.com

*There is no other pending or*
*resolved civil action arising out of the*
*transaction or occurrence alleged in the complaint.*

**COMPLAINT**

**DEMAND FOR JURY TRIAL**

1

NOW COMES Plaintiff, SHELBY DAVIS as Next Friend of E███ D██ , a minor, by and through her attorneys, GIROUX RATTON, P.C., and states as her cause of action against the above-named defendants the following:

1. The acts and occurrences which form the basis for this Complaint occurred within Bay City, County of Bay, State of Michigan.

2. Shelby Davis is the duly appointed Next Friend of E███ D██ for the purpose of bringing this lawsuit.

3. At all times pertinent to this Complaint, Plaintiff Shelby Davis was a resident of Bay County, State of Michigan.

4. At all times pertinent to this Complaint, Bradley W. Merrills, MD, (hereinafter, "Dr. Merrills") was a physician practicing medicine in Bay County, State of Michigan.

5. At all times pertinent to this Complaint, Aliaa Makkiya, MD, (hereinafter, "Dr. Makkiya") was a physician practicing medicine in Bay County, State of Michigan.

6. At all times pertinent to this Complaint, Sheri Block, RN, was a registered nurse residing in, and providing care in, Bay County, State of Michigan.

7. At all times pertinent to this Complaint, Bay Regional Medical Center d/b/a McLaren Bay Region (hereinafter "McLaren Bay Region") was a Michigan corporation doing business in Bay City, Bay County, State of Michigan.

8. The amount in controversy is in excess of TWENTY FIVE THOUSAND ($25,000) DOLLARS.

9. Jurisdiction and venue is proper in this Court.

2

10.     In paragraphs 11 - 80 as set forth below, Plaintiff makes reference to statements contained in the medical records of various health care providers. The recitation of these factual statements should not be interpreted as an admission by Plaintiff as to the factual authenticity or truthfulness of these statements. The statements are set forth below to provide context as to the violations of the standard of care, also described below.

11.     On March 30, 2015 at 1517, Shelby Davis, 19 years old, Gravida 1 para 0, 40 5/7 weeks, presented to McLaren Bay Region for induction of labor.

12.     The admitting physician was Bradley Merrills, M.D.

13.     Complications of pregnancy noted were maternal obesity and baby large for gestational age.

14.     A progress note timed at 1555 on March 30, 2015, indicates Shelby (hereinafter, "the patient") was sent to the hospital after suspicious decelerations were observed on outside testing. Cervical exam demonstrated 2 / 70% / 0 to -1, vertex presentation, clinically adequate pelvis, with an estimated fetal weight of 8 1/4 pounds. Fetal heart tones (FHT) were noted as 135 and reactive, accelerating to 150. A recommendation for induction of labor was made.

15.     At 1554 an order for oxytocin 30 unit/500 ml LR 30 unit IV was entered by Dr. Merrills.

16.     A progress note timed at 1845 notes the patient as resting and feeling crampy. FHT noted as 140 with moderate variability and accelerations. Mild contractions

were noted to occur every 5 minutes. Pitocin was running at 5 mu. Plan: adjust pitocin per protocol, position changes, continue to follow.  The note was signed by Dr. Makkiya.

17.    A progress note timed at 0005 on March 31, 2015, indicates the patient, "is hungry and back is hurting". The plan of care was discussed re: Pitocin off & foley balloon in. The patient reported not really feeling contractions, just back pain. The note indicates the patient desired foley, pitocin off, and an ambien. Vital signs were stable. FHR documented at 145 with moderate variability and accelerations. Contractions every 2-3 minutes. Exam demonstrated 2 / 60%  / -2  posterior / softening. Pitocin running at 11 mu. Plan:  Pitocin off. Foley balloon in now. May have light meal. Tylenol for back ache & prn. Ambien 10 mg prn. Restart pitocin at 0600.

18.    A progress note timed at 0055 indicates that the patient was up in the rocker, states back is hurting much more. She reported strange contractions since the foley was placed. Fetal tachycardia was noted since the foley placement with FHT 160-165 with moderate variability, positive accelerations. Fetal movement audible, patient reports positive fetal movement and hiccups. Discussed removal of foley with patient and fetal tachycardia. Patient agreeable. FHR 160-165 with accelerations, some periods of 150-155 moderate variability and accelerations, contractions every 3-4 minutes. Pitocin off.

19.    A progress note timed at 0110 indicates that the patient was resting, breathing with contractions. She apparently stated she felt "better" with the foley balloon out.   FHR was noted as 150-155 with moderate variability, positive accelerations. Contractions were noted as occurring every 2-3 min, graphing poorly, patient in left

4

lateral. Impression: Fetal tachycardia resolved with foley out. Plan: resume pitocin if contractions space out (?) and epidural for pain relief, position changes.

20.     The records indicates that at 0836 an assisted rupture of membrane was performed by Dr. Merrills, with clear fluid.

21.     At 0840 Dr. Merrills documented that the patient was 3-4/ 70% / 0 vtx, AROM clear fluid ... FHT 130s variable moderate, with accelerations to 150. Contractions were every 3-5 minutes, on pitocin. The patient expects vaginal delivery.

22.     Between 0900 - 0910 an epidural was placed.

23.     A progress note timed at 1315, authored by Dr. Makkiya, indicates the following, "patient comfortable with epidural. FHR 145 moderate variability, reactive with (?) variable. Toco: contractions every 2-3 minutes. SVE 4-5 cm / 70 % / -2. IFM was not working well so was dislodged ... Plan: continue close observation, change maternal position. ... variable decelerations earlier; have resolved."

24.     A progress note timed at 1520, authored by Dr. Makkiya indicates the following, "patient comfortable, no complaints. FHR: ? variable decels assuming baseline 140, recurrent with contractions. Toco: contractions every 2 minute. SVE 5 cm / 70% / caput ++. Bedside US - vertex. IFM inserted without difficulty; Hauer wasn't marking. Plan: start amnioinfusion and pitocin to 4 and reassess, will monitor closely."

25.     At 1532 Dr. Makkiya ordered pitocin at 4 mmu/min.

26.     At 1748 an order was entered by Dr. Makkiya to restart pitocin at 1 mu/min and increase as needed for adequate contractions.

27.     A nursing entry timed at 1900 indicates Oxytocin was at 3 mu. FHT's 145 with moderate variability, frequency 3-4 minutes, duration 60-120 seconds. The patient's father and sister were observed at bedside.

28.     A progress note timed at 1920, authored by Dr. Makkiya, indicates the following, "patient is having back pain. FHR 160 moderate variability, variable decelerations noted. Pitocin at 3. Some questionable late decelerations. Toco: contractions every 3 - 4 minutes. SVE 5-6 cm / 80% / -2 / caput ++. Patient's position was changed. Will continue close monitoring. Anesthesia team was updated through [? indecipherable] for possible need for cesarean section."

29.     A note authored by Sheri Block, RN, timed at 1930 indicates the following, "Dr. Makkiya has been in to check patent. Vaginal exam 5-6 cm. Patient repositioned on right side with abdomen on mattress. FHTs have been 160s and go down to 120-130s with contractions. Declarations do have late timing. Variability is moderate. Contractions are 3-4 minutes, 50-70 seconds 65-80 mm/Hg with a resting tone of 50 despite trying to rezero IUPC."

30.     At 1945 Sheri Block, RN noted FHT are 170 at this time. Variability is moderate.

31.     A note authored by Sheri Block, RN, timed at 2000 indicates the following, "Foley catheter inserted with clear yellow urine returned. 400cc obtained. FHT are 160-170 with dips in FHTs with contractions 130-140. Decelerations continue to have late timing."

32.     At 2007 the patient's blood pressure was noted to be 106/44.

33.     A nursing note, entered by Sheri Block, RN, timed at 2015 indicates the following, "FHTs are 160-170 with moderate variability, contractions are 3-4 minutes. 50-70 seconds 60-75 mm/Hg with a resting tone of 35-49. Patient has had decelerations to 95. Dr. Makkiya is at desk viewing strip."

34.     At 2023 the patient's blood pressure was noted to be 72/45.

35.     A note entered by Sheri Block, RN, timed at 2030 indicates the following, "FHTs are 160 with moderate variability. Contractions are not recording well at this time."

36.     A note entered by Sheri Block, RN, timed at 2036 indicates the patient's blood pressure was 79/41 and that Pitocin was increased to 4 mu per direction of Dr. Makkiya.

37.     A note entered by Sheri Block, RN, timed at 2045, indicates the following, "FHT are 165 with moderate variability. Contractions are every 3 minutes. Pitocin continues to infuse at 4 mu. IV patent and infusing well. IV rate has been increased due to low BP. Foley is draining clear yellow urine."

38.     At 2052 the patient's blood pressure was noted to be 71/41.

39.     A progress note timed at 2100, authored by Dr. Makkiya, indicates the following, "Patient is still having some back pain. BP 75/45 IV fluid bolus.  FHR 150 moderate variability, variable / ? late decels noted. + fetal scalp stim. Went up to 170s upon my exam. SVE: 7 cm / 90-100% / 0. Made a significant change this time. Decels are less frequent with fetal scalp stim. Will monitor closely."

40.     A note timed at 2100, by Sheri Block, RN indicates the following, "dilatation 7, effacement 90, station 0. FHTs are 160. Variability is moderate.

Contractions are 3 minutes but intran does not appear to be working well. Amnio infusion continues with only small return of fluid. Dr. aware. Dr. Makkiya in room for vaginal exam. Patient is 7 cm."

41.     At 2108 the patient's blood pressure is recorded as 115/46.

42.     A note timed at 2115, by Sheri Block, RN indicates the following, "FHTs 170 at this time. Variability is minimal to moderate. Contractions are every 3 minutes 50-70 seconds, 60-75 mm/Hg with a resting tone of 40-45. Amnio infusion continues, family supportive at bedside."

43.     At 2122 the patient's blood pressure is recorded as 74/54.

44.     A note timed at 2130, by Sheri Block, RN indicates the following, "FHTs are 160 with moderate variability. Intran is again not picking up contractions well. Patient having emesis."

45.     At 2137 the patient's blood pressure is recorded as 99/55.

46.     At  2145 Sheri Block, RN documented, "FHTs are 165. Variability is minimal to moderate. Contractions are every 3 minutes 50-60 seconds 65 mm/Hg with a resting tone of 45."

47.     At 2149 the patient's pulse was noted as 113.

48.     At 2153 the patient's blood pressure is recorded as 105/61.

49.     A progress note timed at 2200, authored by Dr. Makkiya, indicates the following, " SVE: 8-9 cm / +1 / 100% caput ++. FHR 175 minimal to moderate variability, variable decelerations are still seen, but not as frequent, seen every 3-4

contractions. Plan:  Expect SVD.   Increased baseline - afebrile. Close monitoring. IV bolus."

50.    At 2200 Sheri Block, RN documented, "FHTs are up to 180 and variability is minimal. Position changed. Contractions are every 3 minutes. Patient has had another emesis."

51.    At 2206 the patient's blood pressure is recorded as 99/78.

52.    At 2215 Sheri Block, RN documented, "FHTs 180 minimal to moderate variability. FHT do go down with some contractions to 160. Timing is late."

53.    At 2217 Sheri Block, RN documented, "Variability is minimal. O2 mask is on and positioned changed. FHTs are 180, fluid bolus started."

54.    A note timed at 2230, by Sheri Block, RN indicates the following, "FHTs are 170 with some improvement in variability. IV fluid bolus continues. Patient has O2 on. Dr. Makkiya in room. Contractions are every 3 minutes but intran is not working well."

55.    A note timed at 2235, by Sheri Block, RN indicates, "Vaginal exam done by Dr. Makkiya and patient is complete. FHTs are 170 and variability is minimal to moderate. Patient will start pushing with contractions."

56.    A note timed at 2240, by Sheri Block, RN indicates, "Foley has been removed, 600 ml of urine emptied. Dr. Makkiya in room pushing with patient. FHTs are 180. Epidural decreased to 5 ml by request of Dr. Makkiya."

57.    A note timed at 2245, by Sheri Block, RN indicates, "FHTs 175. Patient has had emesis.

58.     No transducer is noted at 2248.

59.     A note timed at 2250, by Sheri Block, RN indicates, "FHTs 180. Unable to monitor infant while patient is pushing.  FHTs 170-180. Patient pushing with contractions but does not have pushing sensation. Dr. Makkiya remains in room. Intran has been removed by Dr."

60.     A note timed at 2255, by Sheri Block, RN indicates, "FHTs 160. FHTs do go down during pushing but returns to 160-170.FHTs only picking up when US held."

61.     At 2258 FHT was noted as 175.

62.     At 2301 FHT was noted as 155.

63.     At 2305 Sheri Block, RN documented, "FHT went down to 80 with pushing. Is now back up to 180. Pitocin turned off. Contractions are every 2-3 min. Dr. Makkiya continues to push with patient."

64.     At 2310 Sheri Block, RN documented, "FHTs 100-111. Patient to try to push on her side. Position on right side. IV patent and infusing well."

65.     At 2315 Sheri Block, RN documented, "FHTs are 155. Patient pushing with contractions."

66.     At 2320 Sheri Block, RN documented, "FHTs are 170 with minimal variability. Patient encouraged to keep O2 on. IV fluid continues to infuse. Patient's contractions have spaced since pitocin remains off."

67.     At 2325 Sheri Block, RN documented, "FHTs 150. Patient remains on her side. Pitocin restarted at 2 mu."

68.     At 2330 Sheri Block, RN documented, "FHTs 165. Variability is minimal. Patient pushing with Dr. Makkiya in room. FHTs are only recording with US in place."

69.     At 2336 FHTs were noted at 170.

70.     At 2345 Sheri Block, RN documented, "FHTs down to 85 with pushing. Patient is pushing well with tug-of-war assistance. Is bringing head down well."

71.     At 2350 FHTs were noted at 130.

72.     At 2355 Sheri Block, RN documented, "FHTs are 155. Is starting to crown infant. Patient has been given local by Dr. Makkiya for possible episiotomy."

73.     Baby girl E█████ was delivered on or about 12:00 a.m., April 1, 2015, weighing 7 pounds, 7 ounces.

74.     Upon delivery the child was noted as dusky and bluish in color. She required 4 minutes of positive pressure ventilation. APGARS were 3 (1), 6 (5), and 7 (10). The labor and delivery summary includes a labor abnormality of prolonged latent phase, fetal monitor tracings with baseline tachy and variables, amniotic fluid clear with terminal meconium, with no complications of delivery. Venous cord ph was 7.39 with a base excess of -6. Arterial cord ph was 7.21, with a base excess of -13.

75.     At 0046 the infant was noted as having poor tone in the upper extremities and neck and shortly thereafter, the infant made no effort to breastfeed.

76.     At approximately 0530, nursing paged pediatrics with concerns regarding the baby demonstrating "twitching" type movement in the upper extremities. Upon exam the baby was noted to have clenched fists, as well as plantars going down bilaterally.

The baby was arranged to be transferred to Covenant Hospital for a higher level of care for "seizure type" activity.

77.    Upon arrival of the transport team, the infant was noted as pale and showing signs of seizures with oxygen desaturation. The infant required intubation and mechanical ventilation due to apnea requiring positive pressure ventilation. Phenobarbital, ampicillin and gentamicin were given. The infant was then transported to Covenant. While at Covenant the infant had intermittent seizure activity and continued to receive phenobarbital.

78.    E███ was transferred to the University of Michigan on April 4, 2015. Per the hospital chart, E███ demonstrated clinical evidence of seizure activity by 5 to 6 hours of life. According to her mother this may have occurred as early as 45 minutes to 1 hour of life. Prior to transfer, E███ had been started on phenytoin, phenobarbital and pyridoxine. Covenant CT showed possible cerebral edema and a small amount of subdural blood. At the time of admission E███ was diffusely hypotonic with minimal reflexes. She was started on LTM on the day of transfer. This initially showed excessive discontinuity and lack of state modulation/reactivity to external modulation, consistent with severe encephalopathy.

79.    E███ underwent MRI/MRV on April 5. The scan showed restricted diffusion and edema in bilateral cerebral and cerebellar hemispheres. Per the radiology report the findings were consistent with diffuse, possibly severe brain injury. Differential diagnosis included hypoxic ischemic injury versus less likely metabolic disorder. In combination with EEG findings pointing to severe encephalopathy, E███'s MRI

conferred a high risk of a poor neurodevelopmental outcome, and this prognosis was discussed with the family.  E███ was discharged home on April 12, 2015.

80.     Currently E███'s condition includes, brain damage, significant motoric and mental delays, including, but not limited to neurologic injury and other injuries. She has been diagnosed with cerebral palsy.  E███ D█ will need lifelong attendant care because of the injuries she received during labor and delivery, and her ability to participate in the workplace is severely affected.

## COUNT I - NEGLIGENCE
## DR. MERRILLS

81.     The Plaintiff hereby restates, realleges, and incorporates by reference each and every allegation set forth above and further states, in the alternative, the following:

82.     At all times pertinent to this Complaint, Dr. Merrills owed Plaintiff a duty to maintain the standard of care and treatment of his peers within the professional community of physicians practicing Obstetrics and Gynecology.  The requirements of the standard of care included, but were not limited to, the following:

      a.    Monitor and treat hypotension, including, but not limited to performing earlier delivery by Cesarean section for indications of uteroplacental insufficiency prior to the onset of neurologic injury to the baby;

      b.    Monitor, treat for, and perform Cesarean section for maternal and/or fetal reasons, including but not limited to maternal hypotension and non-reassuring fetal status in labor;

      c.    Carefully and completely examine and assess the pregnant patient and her unborn baby to determine the status of the mother and the baby, such that the delivery should occur before injury could and did occur;

13

d.    Avoid contractions and/or continued labor in the face of Pitocin hyperstimulation with non-reassuring fetal status as per electronic fetal heart monitor tracing, including but not limited to perform earlier delivery;

e.    Carefully and adequately examine and assess the pregnant patient to determine the status of the mother and the baby, including but not limited to, electronic fetal heart monitoring, and intervene to improve the condition of the unborn baby, including repositioning, hydration, oxygen, IV fluids, and advocate to deliver earlier to avoid injury from inadequate oxygen/blood flow;

f.    Accurately and thoroughly record in the medical records all pertinent aspects of the condition of the unborn baby and care provided, including recognition and charting of non-reassuring heart rate changes, interventions taken to improve the condition of the unborn baby, the progress of labor, vital signs, all other actions taken, and/or pertinent information;

g.    Regularly and completely update, re-check, and record the vital signs of both mother and baby, and monitor those pertinent signs and symptoms, and treat, including but not limited to perform earlier delivery;

h.    Carefully assess, interpret and treat the condition of the unborn baby, such as by fetal heart monitoring and uterine contraction activity;

i.    Carefully assess for, diagnose, and treat the presence of non-reassuring changes on the fetal heart monitor, including variable decelerations, and/or late decelerations, tachycardia, and loss of adequate variability, and treat and perform earlier delivery;

j.    Recognize a non-reassuring fetal monitor strip and immediately advise the patients' provider or (other) physician(s) of the existence and of the nature of the non-reassuring changes, including but not limited to diminished variability, prolonged and/or late decelerations, and/or tachycardia, and treat, and perform earlier delivery;

k.    Timely obtain consult or treatment by the patients' provider or (other physician(s), for non-reassuring fetal status, including fetal distress and/or nonreassuring fetal status and perform earlier delivery;

l.    Utilize the chain of command when notification of the concerning signs and symptoms were not immediately responded to; in other

14

words, the physician(s) should have called for or otherwise obtained a doctor to treat the patients and expeditiously deliver the baby;

m.      Other acts and/or omissions to be determined throughout the course of discovery.

83.     Notwithstanding said obligations, and in breach thereof, defendant Dr. Merrills violated the standard of care applicable when he failed to:

a.      Monitor and treat hypotension, including, but not limited to performing earlier delivery by Cesarean section for indications of uteroplacental insufficiency prior to the onset of neurologic injury to the baby;

b.      Monitor, treat for, and perform Cesarean section for maternal and/or fetal reasons, including but not limited to maternal hypotension and non-reassuring fetal status in labor;

c.      Carefully and completely examine and assess the pregnant patient and her unborn baby to determine the status of the mother and the baby, such that the delivery should occur before injury could and did occur;

d.      Avoid contractions and/or continued labor in the face of Pitocin hyperstimulation with non-reassuring fetal status as per electronic fetal heart monitor tracing, including but not limited to perform earlier delivery;

e.      Carefully and adequately examine and assess the pregnant patient to determine the status of the mother and the baby, including but not limited to, electronic fetal heart monitoring, and intervene to improve the condition of the unborn baby, including repositioning, hydration, oxygen, IV fluids, and advocate to deliver earlier to avoid injury from inadequate oxygen/blood flow;

f.      Accurately and thoroughly record in the medical records all pertinent aspects of the condition of the unborn baby and care provided, including recognition and charting of non-reassuring heart rate changes, interventions taken to improve the condition of the unborn baby, the progress of labor, vital signs, all other actions taken, and/or pertinent information;

g.     Regularly and completely update, re-check, and record the vital signs of both mother and baby, and monitor those pertinent signs and symptoms, and treat, including but not limited to perform earlier delivery;

h.     Carefully assess, interpret and treat the condition of the unborn baby, such as by fetal heart monitoring and uterine contraction activity;

i.     Carefully assess for, diagnose, and treat the presence of non-reassuring changes on the fetal heart monitor, including variable decelerations, and/or late decelerations, tachycardia, and loss of adequate variability, and treat and perform earlier delivery;

j.     Recognize a non-reassuring fetal monitor strip and immediately advise the patient's provider or (other) physician(s) of the existence and of the nature of the non-reassuring changes, including but not limited to diminished variability, prolonged and/or late decelerations, and/or tachycardia, and treat, and perform earlier delivery;

k.     Timely obtain consult or treatment by the patient's provider or (other physician(s), for non-reassuring fetal status, including fetal distress and/or nonreassuring fetal status and perform earlier delivery;

l.     Utilize the chain of command when notification of the concerning signs and symptoms were not immediately responded to; in other words, the physician(s) should have called for or otherwise obtained a doctor to treat the patients and expeditiously deliver the baby;

m.     Other acts and/or omissions to be determined throughout the course of discovery.

84.    As a direct and proximate result of the aforementioned violations of the standard of care by Dr. Merrills, E███ D███ suffered an intrapartum hypoxic-ischemic injury and trauma. As such, Plaintiff is entitled to recover for injuries and damages as are deemed fair and just, proximately caused by the aforementioned negligent acts and/or omissions, including, but not limited to the following:

a.     Hypoxic-ischemic encephalopathy;

16

b.    Seizure disorder;

c.    Severe developmental delays, mental retardation, cognitive deficits and other permanent sequelae that will last throughout her life;

d.    All necessary and reasonable medical expenses;

e.    Attendant care;

f.    Other injuries and/or damages yet to be determined.

85.    As a direct and proximate result of each breach of the standard of care as outlined above, E████ D████ suffered a permanent impairment to her cognitive capacity rendering her incapable of making independent responsible life decisions and permanently incapable of independently performing the activities of normal daily living, as such Plaintiff is entitled to the higher noneconomic damage cap pursuant to MCLA 600.1483.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment against the defendants in any amount in excess of TWENTY FIVE THOUSAND ($25,000.00) DOLLARS, together with interest, costs and attorney fees, to which the Plaintiff is deemed to be entitled.

## COUNT II - NEGLIGENCE
## DR. MAKKIYA

86.    The Plaintiff hereby restates, realleges, and incorporates by reference each and every allegation set forth above and further states, in the alternative, the following:

87.    At all times pertinent to this Complaint, Dr. Makkiya owed Plaintiff a duty to maintain the standard of care and treatment of her peers within the professional

community of physicians practicing Obstetrics and Gynecology. The requirements of the standard of care included, but were not limited to, the following:

a.  Monitor and treat hypotension, including, but not limited to performing earlier delivery by Cesarean section for indications of uteroplacental insufficiency prior to the onset of neurologic injury to the baby;

b.  Monitor, treat for, and perform Cesarean section for maternal and/or fetal reasons, including but not limited to maternal hypotension and non-reassuring fetal status in labor;

c.  Carefully and completely examine and assess the pregnant patient and her unborn baby to determine the status of the mother and the baby, such that the delivery should occur before injury could and did occur;

d.  Avoid contractions and/or continued labor in the face of Pitocin hyperstimulation with non-reassuring fetal status as per electronic fetal heart monitor tracing, including but not limited to perform earlier delivery;

e.  Carefully and adequately examine and assess the pregnant patient to determine the status of the mother and the baby, including but not limited to, electronic fetal heart monitoring, and intervene to improve the condition of the unborn baby, including repositioning, hydration, oxygen, IV fluids, and advocate to deliver earlier to avoid injury from inadequate oxygen/blood flow;

f.  Accurately and thoroughly record in the medical records all pertinent aspects of the condition of the unborn baby and care provided, including recognition and charting of non-reassuring heart rate changes, interventions taken to improve the condition of the unborn baby, the progress of labor, vital signs, all other actions taken, and/or pertinent information;

g.  Regularly and completely update, re-check, and record the vital signs of both mother and baby, and monitor those pertinent signs and symptoms, and treat, including but not limited to perform earlier delivery;

h.  Carefully assess, interpret and treat the condition of the unborn baby, such as by fetal heart monitoring and uterine contraction activity;

i.      Carefully assess for, diagnose, and treat the presence of non-reassuring changes on the fetal heart monitor, including variable decelerations, and/or late decelerations, tachycardia, and loss of adequate variability, and treat and perform earlier delivery;

j.      Recognize a non-reassuring fetal monitor strip and immediately advise the patients' provider or (other) physician(s) of the existence and of the nature of the non-reassuring changes, including but not limited to diminished variability, prolonged and/or late decelerations, and/or tachycardia, and treat, and perform earlier delivery;

k.      Timely obtain consult or treatment by the patients' provider or (other physician(s), for non-reassuring fetal status, including fetal distress and/or nonreassuring fetal status and perform earlier delivery;

l.      Utilize the chain of command when notification of the concerning signs and symptoms were not immediately responded to; in other words, the physician(s) should have called for or otherwise obtained a doctor to treat the patients and expeditiously deliver the baby;

m.      Other acts and/or omissions to be determined throughout the course of discovery.

88.    Notwithstanding said obligations, and in breach thereof, defendant Dr. Makkiya violated the standard of care applicable when he failed to:

a.      Monitor and treat hypotension, including, but not limited to performing earlier delivery by Cesarean section for indications of uteroplacental insufficiency prior to the onset of neurologic injury to the baby;

b.      Monitor, treat for, and perform Cesarean section for maternal and/or fetal reasons, including but not limited to maternal hypotension and non-reassuring fetal status in labor;

c.      Carefully and completely examine and assess the pregnant patient and her unborn baby to determine the status of the mother and the baby, such that the delivery should occur before injury could and did occur;

d.      Avoid contractions and/or continued labor in the face of Pitocin hyperstimulation with non-reassuring fetal status as per electronic

19

fetal heart monitor tracing, including but not limited to perform earlier delivery;

e.     Carefully and adequately examine and assess the pregnant patient to determine the status of the mother and the baby, including but not limited to, electronic fetal heart monitoring, and intervene to improve the condition of the unborn baby, including repositioning, hydration, oxygen, IV fluids, and advocate to deliver earlier to avoid injury from inadequate oxygen/blood flow;

f.     Accurately and thoroughly record in the medical records all pertinent aspects of the condition of the unborn baby and care provided, including recognition and charting of non-reassuring heart rate changes, interventions taken to improve the condition of the unborn baby, the progress of labor, vital signs, all other actions taken, and/or pertinent information;

g.     Regularly and completely update, re-check, and record the vital signs of both mother and baby, and monitor those pertinent signs and symptoms, and treat, including but not limited to perform earlier delivery;

h.     Carefully assess, interpret and treat the condition of the unborn baby, such as by fetal heart monitoring and uterine contraction activity;

i.     Carefully assess for, diagnose, and treat the presence of non-reassuring changes on the fetal heart monitor, including variable decelerations, and/or late decelerations, tachycardia, and loss of adequate variability, and treat and perform earlier delivery;

j.     Recognize a non-reassuring fetal monitor strip and immediately advise the patient's provider or (other) physician(s) of the existence and of the nature of the non-reassuring changes, including but not limited to diminished variability, prolonged and/or late decelerations, and/or tachycardia, and treat, and perform earlier delivery;

k.     Timely obtain consult or treatment by the patient's provider or (other) physician(s), for non-reassuring fetal status, including fetal distress and/or nonreassuring fetal status and perform earlier delivery;

l.     Utilize the chain of command when notification of the concerning signs and symptoms were not immediately responded to; in other words, the physician(s) should have called for or otherwise

20

>> obtained a doctor to treat the patients and expeditiously deliver the baby;
>>
>> m.    Other acts and/or omissions to be determined throughout the course of discovery.

89.    As a direct and proximate result of the aforementioned violations of the standard of care by Dr. Makkiya, E█████ D████suffered an intrapartum hypoxic-ischemic injury and trauma. As such, Plaintiff is entitled to recover for injuries and damages as are deemed fair and just, proximately caused by the aforementioned negligent acts and/or omissions, including, but not limited to the following:

>> a.    Hypoxic-ischemic encephalopathy;
>>
>> b.    Seizure disorder;
>>
>> c.    Severe developmental delays, mental retardation, cognitive deficits and other permanent sequelae that will last throughout her life;
>>
>> d.    All necessary and reasonable medical expenses;
>>
>> e.    Attendant care;
>>
>> f.    Other injuries and/or damages yet to be determined.

90.    As a direct and proximate result of each breach of the standard of care as outlined above, E████ D████suffered a permanent impairment to her cognitive capacity rendering her incapable of making independent responsible life decisions and permanently incapable of independently performing the activities of normal daily living, as such Plaintiff is entitled to the higher noneconomic damage cap pursuant to MCLA 600.1483.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment against the defendants in any amount in excess of TWENTY FIVE

21

THOUSAND ($25,000.00) DOLLARS, together with interest, costs and attorney fees, to which the Plaintiff is deemed to be entitled.

**COUNT III - NEGLIGENCE**
**SHERI BLOCK, RN**

91.    The Plaintiff hereby restates, realleges, and incorporates by reference each and every allegation set forth above and further states, in the alternative, the following:

92.    At all times pertinent to this Complaint, Sheri Block, RN owed Plaintiff a duty to maintain the standard of care and treatment of her peers within the professional community of nursing practice.  The requirements of the standard of care included, but were not limited to, the following:

    a.    Monitor and advocate for earlier delivery by Cesarean section for indications of uteroplacental insufficiency prior to the onset of neurologic injury to the baby;

    b.    Monitor and advocate for earlier delivery by Cesarean section for maternal and/or fetal reasons, including but not limited to maternal hypotension and non-reassuring fetal status in labor;

    c.    Carefully and adequately examine and assess the pregnant patient and her unborn baby to determine the status of the mother and the baby, such that the delivery should occur before injury could and did occur;

    d.    Avoid contractions and/or continued labor in the face of Pitocin hyperstimulation with non-reassuring fetal status as per electronic fetal heart monitor tracing, including but not limited to advocate for earlier delivery;

    e.    Carefully and adequately examine and assess the pregnant patient to determine the status of the mother and the baby, including but not limited to, electronic fetal heart monitoring, and intervene to improve the condition of the unborn baby, including repositioning,

hydration, oxygen, IV fluids, and advocate to deliver earlier to avoid injury from inadequate oxygen/blood flow;

f.      Accurately and thoroughly record in the medical records all pertinent aspects of the condition of the unborn baby and care provided, including recognition and charting of non-reassuring heart rate changes, interventions taken to improve the condition of the unborn baby, the progress of labor, vital signs, all other actions taken, and/or pertinent information;

g.      Regularly and completely update, re-check, and record the vital signs of both mother and baby, and monitor those pertinent signs and symptoms, and treat, including but not limited to advocate for earlier delivery;

h.      Carefully assess for, diagnose, and treat the presence of non-reassuring changes on the fetal heart monitor, including variable decelerations, and/or late decelerations, tachycardia, and loss of adequate variability, and treat for the same including, advocate for earlier delivery;

i.      Recognize a non-reassuring fetal monitor strip and immediately advise the patients' provider or (other) physician(s) of the existence and of the nature of the non-reassuring changes, including but not limited to diminished variability, prolonged and/or late decelerations, and/or tachycardia, and treat, and advocate for earlier delivery;

j.      Timely obtain consult or treatment by the patients' provider or (other) physician(s), for non-reassuring fetal status, including fetal distress and/or nonreassuring fetal status and advocate for earlier delivery;

k.      Utilize the chain of command when notification of the concerning signs and symptoms were not immediately responded to; in other words, the physician(s) should have called for or otherwise obtained a doctor to treat the patients and expeditiously deliver the baby;

l.      Other acts and/or omissions to be determined throughout the course of discovery.

93.     Notwithstanding said obligations, and in breach thereof, defendant Sheri Block, RN violated the standard of care applicable when she failed to:

23

a.  Monitor and advocate for earlier delivery by Cesarean section for indications of uteroplacental insufficiency prior to the onset of neurologic injury to the baby;

b.  Monitor and advocate for earlier delivery by Cesarean section for maternal and/or fetal reasons, including but not limited to maternal hypotension and non-reassuring fetal status in labor;

c.  Carefully and adequately examine and assess the pregnant patient and her unborn baby to determine the status of the mother and the baby, such that the delivery should occur before injury could and did occur;

d.  Avoid contractions and/or continued labor in the face of Pitocin hyperstimulation with non-reassuring fetal status as per electronic fetal heart monitor tracing, including but not limited to advocate for earlier delivery;

e.  Carefully and adequately examine and assess the pregnant patient to determine the status of the mother and the baby, including but not limited to, electronic fetal heart monitoring, and intervene to improve the condition of the unborn baby, including repositioning, hydration, oxygen, IV fluids, and advocate to deliver earlier to avoid injury from inadequate oxygen/blood flow;

f.  Accurately and thoroughly record in the medical records all pertinent aspects of the condition of the unborn baby and care provided, including recognition and charting of non-reassuring heart rate changes, interventions taken to improve the condition of the unborn baby, the progress of labor, vital signs, all other actions taken, and/or pertinent information;

g.  Regularly and completely update, re-check, and record the vital signs of both mother and baby, and monitor those pertinent signs and symptoms, and treat, including but not limited to advocate for earlier delivery;

h.  Carefully assess for, diagnose, and treat the presence of non-reassuring changes on the fetal heart monitor, including variable decelerations, and/or late decelerations, tachycardia, and loss of adequate variability, and treat for the same including, advocate for earlier delivery;

i.  Recognize a non-reassuring fetal monitor strip and immediately advise the patients' provider or (other) physician(s) of the existence

24

and of the nature of the non-reassuring changes, including but not limited to diminished variability, prolonged and/or late decelerations, and/or tachycardia, and treat, and advocate for earlier delivery;

j.      Timely obtain consult or treatment by the patients' provider or (other physician(s), for non-reassuring fetal status, including fetal distress and/or nonreassuring fetal status and advocate for earlier delivery;

k.      Utilize the chain of command when notification of the concerning signs and symptoms were not immediately responded to; in other words, the physician(s) should have called for or otherwise obtained a doctor to treat the patients and expeditiously deliver the baby;

l.      Other acts and/or omissions to be determined throughout the course of discovery.

94.    As a direct and proximate result of the aforementioned violations of the standard of care by Sheri Block, RN, E███ D███ suffered an intrapartum hypoxic-ischemic injury and trauma. As such, Plaintiff is entitled to recover for injuries and damages as are deemed fair and just, proximately caused by the aforementioned negligent acts and/or omissions, including, but not limited to the following:

a.      Hypoxic-ischemic encephalopathy;

b.      Seizure disorder;

c.      Severe developmental delays, mental retardation, cognitive deficits and other permanent sequelae that will last throughout her life;

d.      All necessary and reasonable medical expenses;

e.      Attendant care;

f.      Other injuries and/or damages yet to be determined.

95.    As a direct and proximate result of each breach of the standard of care as outlined above, E███ D███ suffered a permanent impairment to her cognitive capacity

rendering her incapable of making independent responsible life decisions and permanently incapable of independently performing the activities of normal daily living, as such Plaintiff is entitled to the higher noneconomic damage cap pursuant to MCLA 600.1483.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment against the defendants in any amount in excess of TWENTY FIVE THOUSAND ($25,000.00) DOLLARS, together with interest, costs and attorney fees, to which the Plaintiff is deemed to be entitled.

### COUNT IV - VICARIOUS LIABILITY
### MCLAREN BAY REGION.

96.    The Plaintiff hereby restates, realleges, and incorporates by reference each and every allegation set forth above and further states, in the alternative, the following:

97.    At all times pertinent to this Complaint, Dr. Merrills, Dr. Makkiya, and Sheri Block, RN, were agents, apparent agents, ostensible agents, servants and/or employees of McLaren Bay Region. As such McLaren Bay Region is vicariously liable for the negligent acts and/or omissions of Dr. Merrills, Dr. Makkiya, and Sheri Block, RN as more fully noted above.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment against the defendants in any amount in excess of TWENTY FIVE THOUSAND ($25,000.00) DOLLARS, together with interest, costs and attorney fees, to which the Plaintiff is deemed to be entitled.

Respectfully submitted,

GIROUX RATTON, P.C.

Dated: October 11, 2016          By: _____

MICHAEL T. RATTON (P42399
Attorneys for Plaintiff
28588 Northwestern Highway, Suite 100
Southfield, MI 48034
(248) 531-8665

## DEMAND FOR JURY TRIAL

NOW COMES Plaintiff, SHELBY DAVIS as Next Friend of E█████ D█████, a

minor, by and through her attorneys, GIROUX RATTON, P.C. and hereby demands a

jury trial in the above captioned cause of action.

Respectfully submitted,

GIROUX RATTON, P.C.

Dated: October 11, 2016          By: _____

MICHAEL T. RATTON (P42399
Attorneys for Plaintiff
28588 Northwestern Highway, Suite 100
Southfield, MI 48034
(248) 531-8665

27

STATE OF NEW JERSEY )
                      ) ss.
COUNTY OF _____ )

## AFFIDAVIT OF MERIT – JEFFREY SOFFER, MD

I Jeffrey Soffer, M.D. being first duly sworn, deposes and says:

1.      I am currently licensed to practice medicine in the State of New Jersey

2.      I am board certified in Obstetrics and Gynecology, having obtained such certification in 1983.

3.      During the one year prior to May of 2015, I devoted the majority of my professional time to the active clinical practice of Obstetrics and Gynecology.

4.      I have reviewed medical records of Shelby Davis as generated by McLaren Bay Region Medical Center, and the records of E██ D██ as generated by McLaren Bay Region Medical Center, Covenant Hospital, and the University of Michigan Medical Center.

5.      I have also reviewed the Notice of Intent to File Claim, pursuant to MCL 600.2912(B), served on behalf of E██ Davis.

6.      I affirm that I have personal knowledge of the facts stated in this affidavit.

7.      If sworn as a witness, I can testify competently to the facts stated in this affidavit.

8.      I believe reasonable cause exists for the filing of the lawsuit concerning the medical treatment that E██ D██ and Shelby Davis received. This opinion and the opinions stated below are based upon the information currently available to me. I

1

reserve the right to modify my opinions as additional information becomes available subsequent to the lawsuit of this matter being filed.

9.     I am of the opinion that the standard of care applicable to Aliaa Makkiya, MD and Bradley W. Merrills, MD was that of their peers within the professional community of physicians practicing Obstetrics and Gynecology.

10.     It is my opinion that the requirements of the standard of care included, but were not limited to, the following:

a) Perform an earlier delivery by Cesarean section for indications of uteroplacental insufficiency prior to the onset of neurologic injury to the baby;

b) Monitor, treat for, and perform an earlier delivery by Cesarean section non-reassuring fetal status in labor;

c) Carefully and completely examine and assess the pregnant patient and her unborn baby to determine the status of the mother and the baby, such that the delivery should occur before injury could and did occur;

d) Avoid contractions and/or continued labor in the face of Pitocin hyperstimulation with non-reassuring fetal status as per electronic fetal heart monitor tracing, including but not limited to perform an earlier delivery by Cesarean section;

e) Carefully assess for, diagnose, and treat the presence of non-reassuring changes on the fetal heart monitor, including variable decelerations, and/or late decelerations, tachycardia, and loss of adequate variability, and treat and perform an earlier delivery by Cesarean section;

f) Recognize a non-reassuring fetal monitor strip and immediately advise the patients' provider or (other) physician(s) of the existence and of the nature of the non-reassuring changes, including but not limited to diminished variability, prolonged and/or late decelerations, and/or tachycardia, and treat, and perform earlier delivery by Cesarean section;

g) Timely obtain consult or treatment by the patients' provider or (other) physician(s), for non-reassuring fetal status, including fetal distress and/or nonreassuring fetal status and perform earlier delivery by Cesarean section.

11. It is my opinion that standard of care was breached by Aliaa Makkiya, MD and Bradley W. Merrills, MD, when they failed to:

    a) Perform an earlier delivery by Cesarean section for indications of uteroplacental insufficiency prior to the onset of neurologic injury to the baby;

    b) Monitor, treat for, and perform an earlier delivery by Cesarean section non-reassuring fetal status in labor;

    c) Carefully and completely examine and assess the pregnant patient and her unborn baby to determine the status of the mother and the baby, such that the delivery should occur before injury could and did occur;

    d) Avoid contractions and/or continued labor in the face of Pitocin hyperstimulation with non-reassuring fetal status as per electronic fetal heart monitor tracing, including but not limited to perform an earlier delivery by Cesarean section;

    e) Carefully assess for, diagnose, and treat the presence of non-reassuring changes on the fetal heart monitor, including variable decelerations, and/or late decelerations, tachycardia, and loss of adequate variability, and treat and perform an earlier delivery by Cesarean section;

    f) Recognize a non-reassuring fetal monitor strip and immediately advise the patients' provider or (other) physician(s) of the existence and of the nature of the non-reassuring changes, including but not limited to diminished variability, prolonged and/or late decelerations, and/or tachycardia, and treat, and perform earlier delivery by Cesarean section;

    g) Timely obtain consult or treatment by the patients' provider or (other) physician(s), for non-reassuring fetal status, including fetal distress and/or nonreassuring fetal status and perform earlier delivery by Cesarean section.

12. It is my opinion that Aliaa Makkiya, MD and Bradley W. Merrills, MD should have undertaken the following actions to achieve compliance with the standard of care:

    a) Perform an earlier delivery by Cesarean section for indications of uteroplacental insufficiency prior to the onset of neurologic injury to the baby;

b) Monitor, treat for, and perform an earlier delivery by Cesarean section non-reassuring fetal status in labor;

c) Carefully and completely examine and assess the pregnant patient and her unborn baby to determine the status of the mother and the baby, such that the delivery should occur before injury could and did occur;

d) Avoid contractions and/or continued labor in the face of Pitocin hyperstimulation with non-reassuring fetal status as per electronic fetal heart monitor tracing, including but not limited to perform an earlier delivery by Cesarean section;

e) Carefully assess for, diagnose, and treat the presence of non-reassuring changes on the fetal heart monitor, including variable decelerations, and/or late decelerations, tachycardia, and loss of adequate variability, and treat and perform an earlier delivery by Cesarean section;

f) Recognize a non-reassuring fetal monitor strip and immediately advise the patients' provider or (other) physician(s) of the existence and of the nature of the non-reassuring changes, including but not limited to diminished variability, prolonged and/or late decelerations, and/or tachycardia, and treat, and perform earlier delivery by Cesarean section;

g) Timely obtain consult or treatment by the patients' provider or (other) physician(s), for non-reassuring fetal status, including fetal distress and/or nonreassuring fetal status and perform earlier delivery by Cesarean section.

13.    It is further my opinion that as a result of the violations of the standard of care as outlined above, E█████ D████ suffered hypoxic-ischemic encephalopathy (HIE) and traumatic brain injury.  HIE is a form of brain damage that was proximately caused in her case by inadequate oxygen/blood flow during labor and delivery.

14.    E████ D████ was severely neurologically and traumatically injured at and around the time of her birth, including but not limited to the hours prior thereto, because of the combination of hypoxia-ischemia (lack of oxygen and blood flow) caused by the continued use of Pitocin, which caused too many contractions and/or contractions that were too strong or too long, to allow necessary amounts of oxygen to go from Ms.

4

Davis' circulatory system to the unborn baby's circulation via placental exchange. The baby should have been delivered hours sooner given the documentation that she was not tolerating the oxygen poor environment brought about by the continued uterine contractions.

15.     Her health care providers should have advocated for and performed a Cesarean section in response to the signs of fetal intolerance of labor at or around 8:00 pm on May 31, 2015. Instead her providers allowed her to remain in the womb. Thereafter, the contractions caused further descent into the pelvis. She was born with marked molding, crown and a large cephalohematoma, a diffuse brain injury and hypoxic-ischemic brain cell death which is significant and permanent.

16.     Further affiant sayeth naught.

_____
Jeffrey Soffer, M.D.

Subscribed and sworn to before me

this 16th day of June , 2016

_____

```
WAGIO W REBO
Notary Public
State of New Jersey
My Commission Expires Jan. 08, 2020
I.D.# 2451414
```

Personally Known ___ or Produced Identification ✓
Type of Identification Produced New Jersey D.L.

STATE OF INDIANA )
                   ) ss.
COUNTY OF Marion )

## AFFIDAVIT OF MERIT – MARY K. EDWARDS-BROWN, MD

I Mary K. Edwards-Brown, M.D. being first duly sworn, deposes and says:

1.     I am currently licensed to practice medicine in the state of Indiana.

2.     I am board certified in Neuroradiology, having obtained such certification in 1995, and I continue to be so certified today.

3.     During the one year prior to May of 2015, I devoted the majority of my professional time to the active clinical practice of Neuroradiology.

4.     I have reviewed medical records of Shelby Davis as generated by McLaren Bay Region Medical Center, and the records of E⬛ Davis as generated by McLaren Bay Region Medical Center and the University of Michigan Medical Center.

5.     I have also reviewed radiology studies from the University of Michigan Medical Center and Covenant Hospital.

6.     I have reviewed the Notice of Intent to File Claim, pursuant to MCL 600.2912(B), served on behalf of E⬛ D⬛

7.     I affirm that I have personal knowledge of the facts stated in this affidavit.

8.     If sworn as a witness, I can testify competently to the facts stated in this affidavit.

9.     I believe reasonable cause exists for the filing of the lawsuit concerning the medical treatment that E⬛ D⬛ and Shelby Davis received. This opinion and the opinions stated below are based upon the information currently available to me. I

1

reserve the right to modify my opinions as additional information becomes available subsequent to the lawsuit of this matter being filed.

10.     I am of the opinion that E█████ D█████ suffered a profound hypoxic ischemic encephalopathy injury at or near the time of her birth.

11.     Upon review of the CT scan of the brain obtained on April 1, 2015, it is my opinion that it demonstrates a generalized decreased density, which is representative of very acute edema that occurred during labor and delivery.

12.     It is further my opinion that the MRI obtained on April 5, 2015 shows profound hypoxic ischemic encephalopathy and extensive acute infarction in a mixed pattern, which is both prolonged hypoxia and anoxia, again more likely than not representing an injury that happened at or near the time of birth

13.     Further affiant sayeth naught.

Mary K. Edwards-Brown, M.D.

Subscribed and sworn to before me

this 28th day of June, 2016

Personally Known ✓ or Produced Identification ___
Type of Identification Produced _____

2

STATE OF NEW MEXICO )
) ss.
COUNTY OF _BERNALILLO_ )

## AFFIDAVIT OF MERIT – GAYLE M. HUELSMANN, RNC

I Gayle Huelsmann, RNC, being first duly sworn, deposes and says:

1.    I am a registered nurse licensed in the state of New Mexico.

2.    I have been an antepartum nurse and a labor and delivery staff nurse for the past thirty-five years.

3.    I am certified in Inpatient Obstetrics and hold a certificate of added qualification in Electronic Fetal Monitoring from the National Certification Corporation in Chicago, Illinois.

4.    I am familiar on a daily basis with the general aspects of Obstetrical nursing, including first and second stage of labor and vaginal cesarean delivery and fetal monitoring. I have regularly participated in the assessment, management and treatment of laboring patients, both term and preterm. I have worked extensively with obstetricians, midwives and maternal fetal medicine specialists in the labor and delivery setting and am very familiar with the collaborative working relationship required among physicians, midwives and nurses who are responsible for managing and monitoring laboring patients.

5.    During the one year prior to March of 2015, I devoted the majority of my professional time to active nursing practice.

6.    I have reviewed medical records of Shelby Davis as generated by McLaren Bay Region Medical Center, and the records of E███ D█ as generated by

1

McLaren Bay Region Medical Center, Covenant Hospital, and the University of Michigan Medical Center.

7.      I have reviewed the Notice of Intent to File Claim, pursuant to MCL 600.2912(B), served on behalf of E███ D███.

8.      I affirm that I have personal knowledge of the facts stated in this affidavit.

9.      If sworn as a witness, I can testify competently to the facts stated in this affidavit.

10.     I believe reasonable cause exists for the filing of the lawsuit concerning the medical treatment that E███ D███ and Shelby Davis received.   This opinion and the opinions stated below are based upon the information currently available to me.  I reserve the right to modify my opinions as additional information becomes available subsequent to the lawsuit of this matter being filed.

11.     I am of the opinion that the standard of care applicable to Sheri Block, RN was that of her peers in nursing practice.

12.     It is my opinion that the requirements of the standard of care included, but were not limited to, the following:

> a) Monitor and advocate for earlier delivery by Cesarean section for indications of uteroplacental insufficiency prior to the onset of neurologic injury to the baby;
>
> b) Monitor and advocate for earlier delivery by Cesarean section for non-reassuring fetal status in labor;
>
> c) Carefully and adequately examine and assess the pregnant patient and her unborn baby to determine the status of the mother and the baby, such that the delivery should occur before injury could and did occur;
>
> d) Avoid contractions and/or continued labor in the face of Pitocin hyperstimulation with non-reassuring fetal status as per electronic fetal

2

heart monitor tracing, including but not limited to advocate for earlier delivery;

e) Carefully and adequately examine and assess the pregnant patient to determine the status of the mother and the baby, including but not limited to, electronic fetal heart monitoring, and intervene to improve the condition of the unborn baby, including repositioning, hydration, oxygen, IV fluids, and advocate to deliver earlier to avoid injury from inadequate oxygen/blood flow;

f) Regularly and completely update, recheck, and record the vital signs of both mother and baby, and monitor those pertinent signs and symptoms, and treat, including but not limited to advocate for earlier delivery;

g) Carefully assess for, diagnose, and treat the presence of non-reassuring changes on the fetal heart monitor, including variable decelerations, and/or late decelerations, tachycardia, and loss of adequate variability, and treat for the same including, advocate for earlier delivery;

h) Recognize a non-reassuring fetal monitor strip and immediately advise the patients' provider or (other) physician(s) of the existence and of the nature of the non-reassuring changes, including but not limited to diminished variability, prolonged and/or late decelerations, and/or tachycardia, and treat, and advocate for earlier delivery;

i) Timely obtain consult or treatment by the patients' provider or (other physician(s), for non-reassuring fetal status, including fetal distress and/or nonreassuring fetal status and advocate for earlier delivery;

j) Utilize the chain of command when notification of the concerning signs and symptoms were not immediately responded to; in other words, the physician(s) should have called for or otherwise obtained a doctor to treat the patients and expeditiously deliver the baby.

13. It is my opinion that standard of care was breached by Sheri Block, RN when she failed to:

a) Monitor and advocate for earlier delivery by Cesarean section for indications of uteroplacental insufficiency prior to the onset of neurologic injury to the baby;

b) Monitor and advocate for earlier delivery by Cesarean section for non-reassuring fetal status in labor;

3

c) Carefully and adequately examine and assess the pregnant patient and her unborn baby to determine the status of the mother and the baby, such that the delivery should occur before injury could and did occur;

d) Avoid contractions and/or continued labor in the face of Pitocin hyperstimulation with non-reassuring fetal status as per electronic fetal heart monitor tracing, including but not limited to advocate for earlier delivery;

e) Carefully and adequately examine and assess the pregnant patient to determine the status of the mother and the baby, including but not limited to, electronic fetal heart monitoring, and intervene to improve the condition of the unborn baby, including repositioning, hydration, oxygen, IV fluids, and advocate to deliver earlier to avoid injury from inadequate oxygen/blood flow;

f) Regularly and completely update, recheck, and record the vital signs of both mother and baby, and monitor those pertinent signs and symptoms, and treat, including but not limited to advocate for earlier delivery;

g) Carefully assess for, diagnose, and treat the presence of non-reassuring changes on the fetal heart monitor, including variable decelerations, and/or late decelerations, tachycardia, and loss of adequate variability, and treat for the same including, advocate for earlier delivery;

h) Recognize a non-reassuring fetal monitor strip and immediately advise the patients' provider or (other) physician(s) of the existence and of the nature of the non-reassuring changes, including but not limited to diminished variability, prolonged and/or late decelerations, and/or tachycardia, and treat, and advocate for earlier delivery;

i) Timely obtain consult or treatment by the patients' provider or (other) physician(s), for non-reassuring fetal status, including fetal distress and/or nonreassuring fetal status and advocate for earlier delivery;

j) Utilize the chain of command when notification of the concerning signs and symptoms were not immediately responded to; in other words, the physician(s) should have called for or otherwise obtained a doctor to treat the patients and expeditiously deliver the baby.

14.     It is my opinion that Sher Block, RN should have undertaken the following actions to achieve compliance with the standard of care:

4

a) Monitor and advocate for earlier delivery by Cesarean section for indications of uteroplacental insufficiency prior to the onset of neurologic injury to the baby;

b) Monitor and advocate for earlier delivery by Cesarean section for non-reassuring fetal status in labor;

c) Carefully and adequately examine and assess the pregnant patient and her unborn baby to determine the status of the mother and the baby, such that the delivery should occur before injury could and did occur;

d) Avoid contractions and/or continued labor in the face of Pitocin hyperstimulation with non-reassuring fetal status as per electronic fetal heart monitor tracing, including but not limited to advocate for earlier delivery;

e) Carefully and adequately examine and assess the pregnant patient to determine the status of the mother and the baby, including but not limited to, electronic fetal heart monitoring, and intervene to improve the condition of the unborn baby, including repositioning, hydration, oxygen, IV fluids, and advocate to deliver earlier to avoid injury from inadequate oxygen/blood flow;

f) Regularly and completely update, recheck, and record the vital signs of both mother and baby, and monitor those pertinent signs and symptoms, and treat, including but not limited to advocate for earlier delivery;

g) Carefully assess for, diagnose, and treat the presence of non-reassuring changes on the fetal heart monitor, including variable decelerations, and/or late decelerations, tachycardia, and loss of adequate variability, and treat for the same including, advocate for earlier delivery;

h) Recognize a non-reassuring fetal monitor strip and immediately advise the patients' provider or (other) physician(s) of the existence and of the nature of the non-reassuring changes, including but not limited to diminished variability, prolonged and/or late decelerations, and/or tachycardia, and treat, and advocate for earlier delivery;

i) Timely obtain consult or treatment by the patients' provider or (other) physician(s), for non-reassuring fetal status, including fetal distress and/or nonreassuring fetal status and advocate for earlier delivery;

j) Utilize the chain of command when notification of the concerning signs and symptoms were not immediately responded to; in other words, the physician(s) should have called for or otherwise obtained a doctor to treat the patients and expeditiously deliver the baby.

15.    It is further my opinion that as a result of the violations of the standard of care as outlined above, E███ D███ suffered hypoxic-ischemic encephalopathy and traumatic brain injury.

16.    E███ D███ was severely neurologically and traumatically injured at and around the time of her birth, including but not limited to the hours prior thereto, because of the combination of hypoxia-ischemia caused by excessive use of Pitocin by the hospital doctors and nurses during the labor. The Pitocin caused too many contractions and/or contractions that were too strong or too long, to allow necessary amounts of oxygen to go from Ms. Davis' circulatory system to the unborn baby's circulation via placental exchange.  The baby should have been delivered hours sooner, at or around 8:00 pm on May 31, 2015, given the documentation that she was not tolerating the oxygen poor environment brought about by Pitocin-intensified uterine contractions.  Her health care providers should have advocated for a Cesarean section in response to the signs of fetal intolerance of labor.   Instead her providers allowed her to remain in the womb. As a result, she was born with marked molding, crown, a large cephalohematoma, hypoxic-ischemic encephalopathy and traumatic brain injury.

17.    Further affiant sayeth naught.

*Gayle M. Huelsmann, RNC*

Gayle M. Huelsmann, RNC

Subscribed and sworn to before me

this 20 day of *June* , 2016

*Debbie Stuyvesant*

```
OFFICIAL SEAL
DEBBIE STUYVESANT
NOTARY PUBLIC
STATE OF NEW MEXICO
My Commission Expires 1-14-19
```

Personally Known  X  or Produced Identification ___
Type of Identification Produced _____

6