UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHELBY DAVIS, as Next Friend of E.D.,
a minor,

       Plaintiff,                            Civil Action No. 17-CV-13611

vs.                                    HON. BERNARD A. FRIEDMAN

BAY REGIONAL MEDICAL CENTER, et al.,

       Defendants.

_____/

### OPINION AND ORDER DENYING DEFENDANT'S MOTIONS TO EXCLUDE PLAINTIFF'S EXPERT WITNESS TESTIMONY

       This matter is presently before the Court on defendant United States' ("defendant")

motions to exclude certain testimony from two of plaintiff's experts [docket entry 64 and 65].

Plaintiff has responded to both motions and defendant has replied.  The Court held *Daubert*[1] hearings

on September 21 and October 28, 2020, to determine whether these experts may testify about the

opinions at issue.

       This case is an obstetrical malpractice suit in which plaintiff represents her minor

daughter, E.D.  Defendants are McLaren Bay Regional Medical Center, nurse Sheri Block, and the

United States.  Pursuant to the Federal Employees Liability Reform and Tort Compensation Act, the

United States has substituted for two obstetricians who were employed at a federally-funded

community health clinic[2] at the time of the incident in question.  Plaintiff claims that the obstetricians

---

[1] *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

[2] The health clinic in question is Great Lakes Bay Health Center, which provides women's care services at the McLaren Bay Regional Medical Center.

and nurse Block[3] negligently failed to manage her labor and delivery and that, as a result, her child was born with severe, life-long health complications, broadly defined as cerebral palsy.

The presently challenged testimony includes opinions on life expectancy from plaintiff's damages expert, Dr. Robert Eilers [docket entry 64], and opinions on head compression trauma from plaintiff's causation expert, Dr. Carolyn Crawford [docket entry 65]. Defendant challenges both experts' opinions under Fed. R. Civ. P. 37(c), on the basis of delayed or incomplete disclosure, as well as Fed. R. Evid. 702, on the basis of alleged unreliability.

### I. Admissibility of Testimony under Rule 37(c)

If a party fails to disclose evidence in accord with a court's scheduling order, the party may face sanctions, including the exclusion of the evidence in question. "Federal Rule of Civil Procedure 37(c)(1)[4] requires absolute compliance with Rule 26(a), that is, it mandates that a trial

---

[3] Plaintiff has sued McLaren Bay Regional Medical Center under a theory of vicarious liability, alleging that the two obstetricians and nurse Block were "agents, apparent agents, ostensible agents, servants and/or employees of McLaren Bay Region." *See* docket entry 1 at 30, ¶ 97.

[4] Rule 37(c)(1) provides that,

> [i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:
>
> > (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;
> >
> > (B) may inform the jury of the party's failure; and
> >
> > (C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)—(vi).

court punish a party for discovery violations in connection with Rule 26 unless the violation was harmless or is substantially justified." *Roberts ex rel. Johnson v. Galen of Va., Inc.*, 325 F.3d 776, 782 (6th Cir. 2003) (internal quotation marks omitted).

The Sixth Circuit has indicated that the following factors should be considered in determining whether a party's failure to make a timely Rule 26 disclosure was substantially justified or harmless under Rule 37(c)(1): "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." *Howe v. City of Akron*, 801 F.3d 718, 748 (6th Cir. 2015). "If the moving party establishes that the non-moving party did not comply with its obligations under Rule 26, the burden shifts to the potentially sanctioned party to show that the violation of Rule 26 was justified or harmless." *Reynolds v. Addis*, No. 18-13669, 2019 WL 8106245, at *1 (E.D. Mich. Oct. 25, 2019).

## II. Admissibility of Expert Testimony under Rule 702

Federal Rule of Evidence 702 governs the admissibility of expert testimony. The rule permits expert testimony in the form of an opinion if

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

In *Daubert*, the Supreme Court provided additional guideposts for district courts tasked with

3

determining the admissibility of expert testimony. The Supreme Court held that

> [f]aced with a proffer of expert scientific testimony . . . the trial judge must determine at the outset, pursuant to Rule 104(a),[5] whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts at issue.

509 U.S. at 592-93.

As to the first of the two *Daubert* prongs, validity, the Supreme Court provided various factors that may "bear on th[is] inquiry." *Id*. at 593. The Sixth Circuit has recently summarized the "non-exhaustive list of factors" as follows:

> (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether the technique has a high known or potential rate of error; and (4) whether the technique enjoys general acceptance within the relevant scientific, technical, or other specialized community.

> *Wilden v. Laury Transp*., LLC, 901 F.3d 644, 649 (6th Cir. 2018) (citing *Daubert*, 509 U.S. at 593–94)). We have also considered an additional factor: "whether the expert prepared his or her opinion 'solely for purposes of litigation.'" *Id*. (quoting *Johnson v. Manitowoc Boom Trucks, Inc*., 484 F.3d 426, 434 (6th Cir. 2007)).

*Blevins v. Kirk*, No. 18-5369, 2019 WL 5151310, at *2 (6th Cir. May 22, 2019). However, the Supreme Court has left open the possibility of other relevant factors. *Id*. at 593 ("we do not presume to set out a definitive checklist or test"). In *Daubert*, the Court emphasized that [t]he inquiry envisioned by Rule 702 is . . . a flexible one." *Id*. at 594. Additionally, the enumerated *Daubert*

---

[5] Rule 104(a) provides: "In General. The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so deciding, the court is not bound by evidence rules, except those on privilege."

factors "are not dispositive in every case and should be applied only where they are reasonable measures of the reliability of expert testimony." *In re Scrap Metal Antitrust Litigation*, 527 F.3d 517, 529 (6th Cir. 2008) (internal quotation marks omitted).

The Supreme Court further held in *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), that "the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id*. at 142 (emphasis in original). However, despite the broad discretion allowed district courts when making this determination, the inquiry is focused on scientific validity. As the Sixth Circuit explained,

> [b]y defining evidentiary reliability in terms of scientific validity, the *Daubert* Court instructed district courts that their primary function as gatekeepers is to determine whether the principles and methodology underlying the testimony itself are valid—not to second guess the validity of conclusions generated by otherwise valid methods, principles, and reasoning.

*Pride v. BIG Corp.*, 219 F.3d 566, 577 (6th Cir. 2000) (internal quotation marks omitted).

In addition to scientific validity, the *Daubert* test, in line with Rule 702, requires that expert testimony assist the trier of fact. "This requirement has been interpreted to mean that scientific testimony must 'fit' the facts of the case, that is, there must be a connection between the scientific research or test result being offered and the disputed factual issues in the case in which the expert will testify." *Id*. at 578.

Although "the rejection of expert testimony is the exception rather than the rule," Fed. R. Evid. 702 advisory committee's notes to 2000 amendments, the party offering the testimony bears the burden of establishing admissibility by a preponderance of the evidence. *See Pride*, 219 F.3d at 578. "Expert testimony is properly excluded if it 'is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data

and the opinion proffered.'"  *United States v. Reynolds*, 626 F. App'x 610, 614 (6th Cir. 2015) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

### III. Dr. Robert Eilers's Life Expectancy Testimony

Defendant challenges Dr. Eilers's life expectancy testimony on two grounds.  First, defendant contends that the testimony should be excluded pursuant to Rule 37(c) because Dr. Eilers's transcribed evaluation of E.D., which contained his life expectancy opinions and the data and facts which form their basis, was not timely disclosed.  Second, defendant questions the methodology Dr. Eilers employed in forming his life expectancy opinion, particularly as applied to this case, and argues for its exclusion under Rule 702.

### A. Exclusion under Rule 37(c)

Both parties acknowledge that Dr. Eilers's evaluation was belatedly disclosed in violation of Fed. R. Civ. P. 26(a)(2)(B).[6]  *See* Def.'s Eilers Br. at 6; Pl.'s Eilers Resp. Br. at 7-8.

---

[6] Rule 26(a)(2)(B) provides that,

> [u]nless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report—prepared and signed by the witness—if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony. The report must contain:
>
> > (i) a complete statement of all opinions the witness will express and the basis and reasons for them;
> >
> > (ii) the facts or data considered by the witness in forming them;
> >
> > (iii) any exhibits that will be used to summarize or support them;
> >
> > (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;

According to the Court's February 12, 2019, scheduling order, plaintiff's Rule 26(a)(2) Expert Disclosures were due by February 15, 2019.  *See* docket entry 50.  However, Dr. Eilers's evaluation was not disclosed until May 29, 2019, at his deposition.  *See* Pl.'s Eilers Resp. Br. at 3.  The issue is whether his opinions should be excluded as a consequence.

The Court will address the *Howe* factors in reverse order, starting with the fifth factor – plaintiff's explanation for failing to meet the discovery deadline.  Plaintiff's counsel contends that they first saw Dr. Eilers's evaluation at his deposition and "equally shared any surprise defense counsel had with regard to the production of this evaluation and the life expectancy opinion."  Pl.'s Eilers Resp. Br. at 8.  Dr. Eilers indicated that he conducted and dictated the results of E.D.'s life expectancy evaluation in November 2017, eighteen months before it was disclosed to counsel for either party.  *Id*. at 3.  Plaintiff's counsel alleges that, despite making various attempts to obtain materials pertaining to Dr. Eilers's meeting with E.D., plaintiff took until May 24, 2019, to provide counsel with the email purportedly containing Dr. Eilers's evaluation.  *Id*. at 7.  While plaintiff's counsel immediately forwarded this communication to defense counsel, the evaluation was not actually attached to plaintiff's email or, subsequently, plaintiff's counsel's email to defense counsel. *Id*.  Consequently, the evaluation was not disclosed until five days later at Dr. Eilers's deposition. The evidence and explanation presented, while weak, indicate inadvertence or negligence (at worst), not "underhanded gamesmanship."  *Howe*, 801 F.3d at 749; *see also Iuoe Loc. 324 Ret. Tr. Fund v. LGC Glob. FM, LLC*, No. 17-13921, 2020 WL 6391622, *4 (E.D. Mich. Nov. 2, 2020) (concluding that the delay "appears more likely to be the result of negligence or oversight," despite the lack of explanation).

---

(vi) a statement of the compensation to be paid for the study and testimony in the case.

Regarding the fourth factor, the importance of plaintiff's expert report is manifest, as plaintiff would be hard-pressed to prove future damages without Dr. Eilers's life expectancy estimations. As to the third factor, when defendant filed the instant motion, there was no trial date set. At present, the trial is scheduled for April 13, 2021, although, given the state of the Covid-19 pandemic, there is a strong likelihood that the trial will have to be postponed. Under the circumstances, allowing Dr. Eilers's evaluation and related testimony will not disrupt the trial. Finally, regarding the first two factors – the degree of surprise and the ability for it to be cured – to the extent defendant was surprised by any of Dr. Eilers's opinions, the surprise was cured when defendant deposed Dr. Eilers at length about his opinions and their basis. Further, defendant has since retained its own experts who will testify concerning E.D.'s life expectancy. Pl.'s Eilers Resp. Br. at 8.

Thus, while defendant accurately asserts that plaintiff was required to disclose Dr. Eilers's life expectancy opinions at an earlier date, under the facts presented, the Court finds the explanation for the delay to be harmless.

### B. Exclusion under Rule 702

Defendant next challenges the scientific reliability of Dr. Eilers's opinions regarding E.D.'s life expectancy. Defendant argues that "Dr. Eilers's opinion rests solely on life tables for girls of E.D's age and on his anecdotal experience treating patients." Def.'s Eilers Br. at 12. Defendant further contends that Dr. Eilers ignores "the substantial body of peer-reviewed studies that have investigated the life expectancies for children with cerebral palsy," *id*. at 13, and "the life risks that E.D. actually has, such has her epilepsy, her inability to eat due to issues with swallowing (necessitating the gastric tube), her immobility, and even her inability to communicate . . . ." *Id*. at 15. Defendant concludes that Dr. Eilers's life expectancy testimony is "speculative [and]

8

unsupported," *id*. at 14, and "fails to fit the facts of the case." *Id*. at 15.

The Court nonetheless finds that Dr. Eilers's life expectancy testimony is admissible under Rule 702. Dr. Eilers possesses extensive qualifications to opine on E.D.'s life expectancy. He "has been practicing medicine since 1981, is board certified in Physical Medicine and Rehabilitation, has practiced as a Physiatrist for nearly 40 years and he has served as a medical director for numerous hospital and rehabilitation facilities." Pl.'s Eilers Resp. Br. at 15. Dr. Eilers has also made "care for both pediatric and adult cerebral palsy patients . . . a regular component of his practice for many years." *Id*.

Defendant does not challenge the scientific nature of the testimony or the sufficiency of the facts or data supporting Dr. Eilers's opinion per se. Rather, defendant takes issue with the reliability of Dr. Eilers's largely experience-based opinion and its applicability to the present case. The Supreme Court has recognized the admissibility of expert testimony backed by "personal experience," so long as it is paired with "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152. Dr. Eilers based his opinion on "his review of E.D.'s medical history, his evaluation of E.D., his understanding of and experience in treating patients with cerebral palsy and similar diseases and/or disabilities through nearly 40 years of clinical practice and experience, and the 2018 Centers for Disease Control life mortality tables . . . ." Pl.'s Eilers Resp. Br. at 16. While defendant criticizes Dr. Eilers's focus on general mortality tables as disconnected from the facts in this case, he has found that "proper care is a main determinant in achieving a longer life expectancy," *id*., and "many times . . . patients live beyond what is expected . . ." *Id*. at 17. Further, based on the facts presented by the parties in the instant motion, the few existing studies on life expectancy estimates for children with cerebral palsy do not control for the nature or degree of care provided. *Id*. at 16, 18.

Finally, Dr. Eilers did not prepare his opinion "solely for purposes of litigation." *Manitowoc Boom*, 484 F.3d at 434 (explaining that testimony from such experts "should be viewed with some caution"). Plaintiff retained Dr. Eilers to advise her regarding her daughter's future care needs, "and his opinion on her life expectancy was reached as a component of that evaluation and in generating his life care plan for E.D." Pl.'s Eilers Resp. Br. at 1.

Under the circumstances, the Court shall deny defendant's motion to exclude Dr. Eilers's opinion testimony regarding E.D.'s life expectancy.

### IV. Dr. Carolyn Crawford's Head Compression Trauma Testimony

Dr. Crawford's challenged testimony addresses the cause of E.D.'s medical complications at birth. Specifically, Dr. Crawford opines that E.D. suffered severe head trauma while exiting plaintiff's birth canal, which, combined with hypoxic-ischemic encephalopathy ("HIE"),[7] resulted in her severe and permanent neurological condition. Dr. Crawford labels her theory "HIE + trauma." Defendant challenges Dr. Crawford's head compression trauma testimony on two grounds. First, defendant contends that the expert's disclosures were incomplete at the filing deadline and should thus be excluded pursuant to Rule 37(c). Second, defendant questions the methodology Dr. Crawford employed in forming her opinion concerning head compression trauma in general and as applied to this case, and thus argues for its exclusion under Rule 702.

### A. Exclusion under Rule 37(c)

Defendant states that "Rule 26(a)(2)(B) requires a complete statement of all opinions the witness will express *and the basis and reasons for them*, to allow for effective cross examination at deposition and trial." Def.'s Crawford Br. at 12 (emphasis in original) (internal quotation marks

---

[7] Hypoxic-ischemic encephalopathy is defined as "generally permanent brain injury resulting from a lack of oxygen or inadequate blood flow to the brain." *Encephalopathy, hypoxic ischemic*, Stedman's Medical Dictionary (28th ed. 2006).

and citations omitted).  Defendant argues that Dr. Crawford "failed to provide any basis in the scientific or medical literature for [the] opinions in her report," *id*. at 11, preventing defendant from preparing for her deposition.  *Id*. at 13.  Defendant concludes that this deficient submission should trigger exclusion under Rule 37(c).

In response, plaintiff argues that the basis for Dr. Crawford's expert opinion was timely disclosed in a detailed nine-page report on February 8, 2019.  *See* Pl.'s Crawford Resp. Br. at 1, 7.  The bases provided in this report include E.D.'s medical records and reports from various physicians, among other sources.  *See* Def.'s Crawford Br. Ex. A, at 1-7.  If the Court finds that Dr. Crawford's discovery disclosures were incomplete, plaintiff argues that the alleged violation Rule 26(a)(2)(B) should be deemed substantially justified or harmless under *Howe*.  *See* Pl.'s Crawford Resp. Br. at 11.

Based on the parties' briefs and the arguments presented at the *Daubert* hearing ("9/21/20 Hr'g"), the Court finds that Dr. Crawford's disclosures were incomplete and thus in violation of Rule 26(a)(2)(B).  Post-deadline submissions or deposition testimony, though potentially curative of harm or surprise caused by a Rule 26 violation, do not erase the violation itself.  Although Dr. Crawford's report did provide some basis for her opinion, the hundreds of pages of medical literature that were subsequently provided defense counsel strongly suggest that the original disclosure was incomplete.  *See id*. at 12 (describing a belated submission to defense counsel, which contained "approximately 400 pages of medical literature records cited therein"); *see also* 9/21/20 Hr'g Tr. at 11-12.  As the Court stated at the September 21 *Daubert* hearing, it is "the obligation of the party to disclose everything, everything that [the] witness has used to make her . . . conclusions as to her report."  9/21/20 Hr'g Tr. at 10.

Nonetheless, the Court finds Dr. Crawford's testimony should not be barred pursuant

to Rule 37(c)(1).  As to surprise and its curability, defendant had ample opportunity to raise deficiencies in Dr. Crawford's expert report prior to her deposition.  Defendant then had the opportunity to depose Dr. Crawford, which eliminates the surprise otherwise caused by the deficient filing.  Third, as mentioned above, allowing Dr. Crawford's testimony will not disrupt the trial, as the present April 13, 2021, trial date will likely be postponed due to the ongoing global health crisis.  Fourth, Dr. Crawford's testimony is central to plaintiff's theory of causation, and thus of great importance to plaintiff's case.  Finally, plaintiff indicates that any deficiencies in Dr. Crawford's report, if any, were unintentional.  *See id.* at 13.  Overall, while plaintiff provides a relatively weak explanation for the deficiencies in Dr. Crawford's report, the *Howe* factors weigh against exclusion under Rule 37(c).

### B. Exclusion under Rule 702

 Defendant next challenges the scientific validity of Dr. Crawford's methodology, as to both general and specific causation – i.e., whether this kind of trauma can cause neonatal encephalopathy and whether it caused neonatal encephalopathy in this case, respectively.

As to general causation, defendant argues that Dr. Crawford overwhelmingly relies upon her own testimony in prior litigation, as opposed to peer reviewed studies or data produced and accepted by the medical community.  Def.'s Crawford Br. at 14, 16, 17.  In response, plaintiff states that "Dr. Crawford's expert report and deposition testimony stated that the basis for her opinion was found in the medical records and her experience, training and general fund of knowledge."  Pl.'s Crawford Resp. Br. at 15.

As with Dr. Eilers's testimony, defendant does not challenge the scientific nature of Dr. Crawford's opinion, nor does it question the sufficiency of the facts or data underlying the opinion.  Rather, the parties' disagreement largely rests on the reliability of Dr. Crawford's opinion,

given her reliance on her own experience, rather than peer reviewed studies. Dr. Crawford possesses extensive qualifications to opine on E.D.'s condition. She is an expert in neonatal-preinatal medicine with over forty years of experience. Pl.'s Crawford Resp. Br. at 1. Dr. Crawford has also held various positions in academia and hospital administration, 9/21/20 Hr'g Tr. at 40, and has long "been involved with teaching [and] studying problems during pregnancy, labor and delivery that can have an impact on the fetus." *Id.* at 39. Plaintiff argues that Dr. Crawford based her opinion on E.D.'s pre- and post-birth medical records, a CT scan performed by the University of Michigan, published literature, and her own experience with similarly situated newborns. Pl.'s Crawford Resp. Br. at 7-8, 16.

As to causation in this case specifically, defendant challenges the differential diagnosis[8] used to support Dr. Crawford's "HIE + trauma" theory. Def.'s Crawford Br. at 19-20. Defendant argues that Dr. Crawford brushed over or did not adequately pursue alternative explanations for E.D.'s condition, despite her admission that "not all causes of HIE are known." *Id.* at 20-21. In particular, defendant criticizes Dr. Crawford's emphasis on E.D.'s cone-shaped head at birth, which, Dr. Crawford herself concedes, can be found on "neurologically intact newborns." *Id.* at 23. Defendant adds that "no other medical provider or expert shares [Dr. Crawford's] opinion that 'trauma' caused or contributed to E.D.'s neurological injuries." *Id.* Defendant concludes that Dr.

---

[8] The Sixth Circuit has described differential diagnosis as follows:

> Differential diagnosis is a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated . . . [A] physician who applies differential diagnosis to determine causation considers all relevant potential causes of the symptoms and then eliminates alternative causes based on a physical examination, clinical tests, and a thorough case history.

*Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671, 678 (6th Cir. 2011) (internal quotation marks and citations omitted).

Crawford's opinion is based on the fallacy of "temporal proximity," rather than sound scientific methodology.  *Id.*

The Sixth Circuit has long "recognized differential diagnosis as an 'appropriate method for making a determination of causation for an individual instance of disease.'"  *Pluck*, 640 F.3d at 678 (quoting *Hardyman v. Norfolk & W. Ry. Co.*, 243 F.3d 255, 260 (6th Cir. 2001).  However, the Sixth Circuit has also emphasized that "[s]imply claiming that an expert used the 'differential diagnosis' method is not some incantation that opens the *Daubert* gate."  *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 674 (6th Cir. 2010).  When assessing an expert witness's differential diagnosis, the Sixth Circuit has instructed district courts to raise the following questions:

> (1) Did the expert make an accurate diagnosis of the nature of the disease?  (2) Did the expert reliably rule in the possible causes of it?  (3) Did the expert reliably rule out the rejected causes?  If the court answers 'no' to any of these questions, the court must exclude the ultimate conclusion reached.

*Id.*

Plaintiff states that "Dr. Crawford considered genetics, infection, congenital defect of brain formation, and inborn error of metabolism in her differential diagnosis."  Pl.'s Crawford Resp. Br. at 22.  She ruled out each alternative, citing a medical basis for her conclusions, including E.D.'s medical records from the University of Michigan and the State of Michigan, E.D.'s brain imaging, and the presence/absence of cultures.  *Id.* at 22-23.  Plaintiff further argues that Dr. Crawford's "HIE + trauma" theory was shaped by more than E.D.'s conical head at birth.  Rather, she considered various indicators of E.D.'s well-being pre-, during, and post-birth, which collectively informed her opinion.  *Id.* at 1-2, 24; 9/21/20 Hr'g Tr. at 65-71 (providing a detailed explanation of the basis for Dr. Crawford's trauma theory); 9/21/20 Hr'g Tr. at 79-81 (describing the wide acceptance of Dr. Crawford's underlying methodology).  Notably, it does appear that Dr. Crawford

14

was solely retained for litigation purposes – a role that she has played in numerous cases across the country.  Nonetheless, considering the various bases for Dr. Crawford's opinion, combined with her qualifications and experience in this field, her causal methodology satisfies Rule 702.

### V. Conclusion

"Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert*, 509 U.S. at 596.  For the above reasons, the Court concludes that defendant's objections do not bar the challenged portions of Dr. Eilers's or Dr. Crawford's expert testimony, but rather raise issues for the fact finder to weigh at trial.  *See In re Scrap Metal*, 527 F.3d at 524.  Accordingly,

IT IS ORDERED that defendant's motion to exclude life expectancy testimony from plaintiff's expert, Dr. Robert Eilers, is denied.

IT IS FURTHER ORDERED that defendant's motion to exclude head trauma testimony from plaintiff's expert, Dr. Carolyn Crawford, is denied

s/Bernard A. Friedman
BERNARD A. FRIEDMAN
SENIOR UNITED STATES DISTRICT JUDGE

Dated:  January 20, 2021
        Detroit, Michigan